(50 South. 166.)

No. 16,856.

SHEA v. SEWERAGE & WATER BOARD OF NEW ORLEANS.

(June 30, 1909.)

1. MUNICIPAL CORPORATIONS (§ 374*) — CONTRACTS FOR PUBLIC IMPROVEMENT—ACTIONS BY CONTRACTOR.

Where a city forbade the contractor for the construction of sewers to go on with the work, and completed the work at the expense of the contractor under the contract providing that any balance left after completing the work must be paid to the contractor, the latter could sue for the balance without showing that he had completed the work to the satisfaction of the engineer, though the contract provided that no payment should be made until the work was completed to the satisfaction of the engineer.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 374.*]

2. PLEADING (§ 36*)—ANSWER—ADMISSIONS—CONCLUSIVENESS.

Where a city, sued by a sewer contractor for extra work, admitted in its answer that more than a specified sum was due for extra work, it could not except to the petition because it failed to allege that the extra work had been ordered in writing as required by the contract.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 81–86; Dec. Dig. § 36.*]

3. MUNICIPAL CORPORATIONS (§ 360*) — CONTRACTS FOR PUBLIC IMPROVEMENTS — CONSTRUCTION.

A sewer contractor may recover for extra work rendered necessary for their construction without showing that the extra work was ordered in writing as provided by the contract.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892; Dec. Dig. § 360.*]

4. MUNICIPAL CORPORATIONS (§ 363*) — CONTRACTS FOR PUBLIC IMPROVEMENTS—LIABILITY OF CONTRACTOR.

A sewer contractor is not responsible for failures in the work except so far as they result from his fault.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 363.*]

5. MUNICIPAL CORPORATIONS (§ 374*) — CONTRACTS FOR PUBLIC IMPROVEMENTS—LIABILITY OF CONTRACTOR.

Evidence, in an action by a sewer contractor against a city for money due under his contract, held to show that failures in sewers due to the pipes separating or cracking were due to the condition of the soil, etc., relieving the contractor from liability therefor.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 374.*]

6. MUNICIPAL CORPORATIONS (§ 358*) — CONTRACTS FOR PUBLIC IMPROVEMENTS—VALIDITY.

A stipulation, in a contract to construct city sewers, that the general superintendent of the city shall decide all disputes involving the character of the work, its quantity, and the compensation therefor, etc., is valid and will be enforced.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 890; Dec. Dig. § 358.*]

7. MUNICIPAL CORPORATIONS (§ 358*) — CONTRACTS FOR PUBLIC IMPROVEMENTS — CONSTRUCTION.

A stipulation, in a contract to construct city sewers, that the general superintendent of the city shall decide disputes involving the character of the work, its quantity, and the compensation therefor, only authorizes the general superintendent to judge of the manner in which the work shall be done so that it may comply with the specifications, and to condemn all work not coming up to that standard.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 358.*]

8. EVIDENCE (§ 177*)—BEST AND SECONDARY EVIDENCE—ADMISSIBILITY.

Where a fact is ascertainable only by the inspection of a large number of documents made up of numerous detailed statements, a competent witness, who has perused all the documents, may state summarily the net results thereof.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 177.*]

9. EVIDENCE (§ 354*)—BOOKS ADMISSIBLE IN EVIDENCE.

The rule that a litigant's books are not admissible in evidence in his favor is subject to exceptions, and reports of the labor and materials going into a large public improvement, made with a view of keeping a true record, may be accepted by the court as correct, except as

to items especially objected to by the adverse party.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1432–1483; Dec. Dig. § 354.*]

10. MUNICIPAL CORPORATIONS (§ 358*)—CONTRACTS FOR PUBLIC IMPROVEMENTS — CONSTRUCTION.

Under a contract for city sewers, stipulating that the general superintendent of the city shall finally decide disputes involving the character of the work, its quantity, and the compensation therefor, the decision of the general superintendent is conclusive, in the absence of fraud or bad faith on his part, and his measurements of the work control as against measurements made by the contractor's engineer.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 890; Dec. Dig. § 358.*]

11. MUNICIPAL CORPORATIONS (§ 352*)—CONTRACTS FOR PUBLIC IMPROVEMENTS — CONSTRUCTION.

A contractor for city sewers, who was paid for constructing manholes, could not in measuring the length of the foundation under the sewer measure from center of manhole to center of manhole, for to do so he would be paid twice for the same work.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 352.*]

12. MUNICIPAL CORPORATIONS (§ 356*)—PUBLIC IMPROVEMENTS—ESTIMATES.

An estimate of the depth of the cut in the trench for a sewer, based on actual measurements made on the work, controls as against a measurement based on profiles previously made from merely approximate measurements.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 356.*]

13. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACTS—LIABILITY OF CONTRACTOR.

The expense of top sheeting in a sewer trench to overcome a difficulty met with by the sewer contractor in the course of his work falls on him and not on the city.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892; Dec. Dig. § 360.*]

14. MUNICIPAL CORPORATIONS (§ 352*)—CONTRACTS—CONSTRUCTION.

Where the contract for city sewers provided that the cost of drop pipes in manholes should be included in the lump price paid for the manholes, the contractor could not charge extra for such drop pipes.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 352.*]

15. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACTS—LIABILITY OF CONTRACTOR.

A contractor for a city sewer must pay the cost of work rendered necessary in doing the work, such as the draining of a street necessary by reason of a pond in existence when the letting of the contract was advertised, and the expense of removing and repairing overhead wires.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892; Dec. Dig. § 360.*]

16. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACTS—PERFORMANCE.

A contractor for a sewer, who repairs a road for his own convenience, and not by order of the city, cannot recover from the city the cost thereof.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892; Dec. Dig. § 360.*]

17. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACTS—PERFORMANCE.

A contractor constructing a sewer, who makes repairs rendered necessary without his fault and under the order of the city, may recover the cost thereof.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 892; Dec. Dig. § 360.*]

18. MUNICIPAL CORPORATIONS (§ 363*)—CONTRACTS — LIABILITY OF CONTRACTOR — DEFECTS.

Where the contract for a city sewer provided that the brickwork should be left smooth, the cost of painting and plastering the sewer made necessary because of projections of cement, etc., must be borne by the contractor.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 363.*]

19. MUNICIPAL CORPORATIONS (§ 352*)—CONTRACTS—CONSTRUCTION.

The cost of lumber used by a sewer contractor in making the forms for the required masonry work is included in the price paid for the masonry work, and the city is not liable therefor.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 352.*]

20. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACTS—PERFORMANCE.

The amount expended by a sewer contractor in diverting water from his work, brought on the work as the result of other work let to other contractors, is recoverable from the city.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 360.*]

21. MUNICIPAL CORPORATIONS (§ 352*)—CONTRACTS—CONSTRUCTION.

An agreement between a city and its sewer contractor, made during the progress of the work, which relates exclusively to expenses incurred in the removal of water coming from another sewer on the contractor's work, without covering past expenses, does not preclude the contractor from recovering from the city such

past expenses and subsequent expenses incurred for other purposes than for pumping.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 352.*]

**22. MUNICIPAL CORPORATIONS (§ 360*)—CONTRACTS—PERFORMANCE.**

Where a sewer contractor, required to furnish piles 30 feet long to be driven that number of feet, was, after the piles were on the ground, required to drive the piles deeper than 30 feet, thereby increasing the cost of the work, the contractor should be paid as if longer piles had been furnished; the contract making no provision for such a case.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 360.*]

**23. MUNICIPAL CORPORATIONS (§ 374*)—CONTRACTS—REMEDIES OF CONTRACTOR.**

A contractor on a large and protracted work need not preserve as he goes along the evidence sufficient to prove in court every item of expense incurred; but it is only necessary for him to furnish an itemized bill from the books which it was necessary for him to keep, which books were correctly kept and the entries therein made at the time the expenses were incurred.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 374.*]

**24. MUNICIPAL CORPORATIONS (§ 374*)—CONTRACTS—REMEDIES OF CONTRACTOR.**

A contractor for city sewers cannot recover from the city the loss occasioned by the idleness of machines while waiting for permission to begin work, in the absence of evidence that the city was advised of the situation and put in default.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 374.*]

**25. MUNICIPAL CORPORATIONS (§ 374*)—CONTRACTS—REMEDIES OF CONTRACTOR.**

Where a sewer contractor, who had devised a successful appliance for the removal of surplus cement by drawing the appliance through the sewer pipe as construction proceeded, was prevented by the city from using the appliance, the contractor could recover the difference between the cost of cleaning the sewers with and without the appliance.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 374.*]

**26. MUNICIPAL CORPORATIONS (§ 374*)—CONTRACTS—REMEDIES OF CONTRACTOR.**

Where, in an action by a contractor against a city for the balance due for constructing sewers, the city made a reconventional demand for expenses for repairing and cleaning the sewers, the exclusion of evidence of estimate sheets, with the accompanying receipt of the contractor showing payments for regular and extra work, was erroneous.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 374.*]

**27. MUNICIPAL CORPORATIONS (§ 362*)—PUBLIC IMPROVEMENT CONTRACTS—LIABILITY OF CONTRACTOR—LIQUIDATED DAMAGES.**

Where a contractor for city sewers abandoned the work after the city had breached the contract by refusing to make payments, and thereafter the city notified the contractor to quit the work, the contractor was not liable for the liquidated damages stipulated for in the contract for delay in completion.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 362.*]

Appeal from Civil District Court, Parish of Orleans; Frederic Durieve King, Judge.

Action by Thomas J. Shea against the Sewerage & Water Board of New Orleans. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

Omer Villere (E. H. Block and Thomas H. Thorpe, of counsel), for appellant. McCloskey & Benedict and Clegg & Quintero, for appellee.

PROVOSTY, J. The plaintiff, T. J. Shea, was awarded contracts C and F of the numerous contracts for the laying of sewers and their appurtenances in the city of New Orleans. He completed contract F, and had constructed the sewers under contract C, and had cleaned the most of them, ready for inspection, when differences arose between him and the defendant board, over the responsibility for failures which had developed in the sewers, which led him to abandon the contract and bring this suit. He avers that he fulfilled these contracts, and demands $145,483.60, which, he alleges, is the balance due him. The claim is divided into amounts for regular work under the contracts, for extras, and for damages. The claims for extras and damages are itemized in exhibits annexed to the petition.

The defenses are a general denial and the special defenses: that plaintiff was paid all that was due under contract F; that he abandoned contract C incomplete; that there was to his credit at that time on the books of defendant $79,607.28; but that defendant

has since then completed the sewers at the expense of plaintiff, as it had a right to do under the contract, at a cost of $54,014.92, and has, moreover, expended, in repairing damage caused by plaintiff and in other extra work, as set forth in detail, $1,564.26; that these expenses offset pro tanto the said credit of plaintiff; and that plaintiff owes, in addition, $41,100, liquidated damages for delay in the completion of said contract, being 411 days at $100 per day, as stipulated in said contract, which more than offsets the balance to the credit of plaintiff, leaving him indebted to defendant in the sum of $16,378.90, for which defendant prays judgment.

Defendant filed in this court an exception of no cause of action based on the grounds that plaintiff has annexed and made part of his petition the contract upon which his suit is brought, and yet has failed to allege that the work for the price of which he sues has been completed to the satisfaction of defendant's general superintendent, or that said officer, in withholding his approval, has been actuated by fraud or bad faith, although said contract provides that no payment shall be due until the work contracted for is completed to the satisfaction of said officer; and, also, that plaintiff is asking payment for extra work, and yet has not alleged that such extra work was ordered in writing, although said contract provides that no extra work shall be paid for unless ordered in writing.

It is needless to consider what merit this exception might have had if filed in limine, while the suit stood on the naked petition. Perhaps defendant might have then contended that it had the right to withhold payment until plaintiff had shown that he had completed the work to the satisfaction of the engineer, and that it owed nothing for extra work not shown to have been ordered in writing; but in its answer defendant alleged that it had forbidden plaintiff to go on with the work, and had, itself, completed it at the expense of plaintiff, and that it had done so under and by virtue of clause 265 of the contract. If so, plaintiff certainly has a cause of action for whatever balance may be left of the money earned by him under the contract after deduction of the expense of completing the work. By going into possession of the work, thereby accepting the benefit of it so far as beneficial, defendant most unquestionably incurred liability to the extent of such benefit; that is to say, to the amount due plaintiff for work done after deduction of the expense of completing the work. More than this, the said clause 265 expressly provides that any balance left over after completion of the work must be paid to the contractor. The suit is for this balance. Whether there is one, and how large it is, is the matter in litigation. In other words, the suit, as it stands on this appeal, is simply one in settlement of accounts.

So far as the petition not showing a cause of action for failure to allege that the extra work was ordered in writing is concerned, the answer expressly admits that more than $10,000 is due for extra work, and it intimates that a further admission will in all probability be made later. After such an admission there is not much room for an exception of no cause of action.

Touching the necessity of a written order for these extras, we may say here, once for all, that most of the claims are for damages and repair work, and work necessary for the construction of the sewers, such as plaintiff had no discretion about, but had to do, or else abandon the work of construction. For all such extras no written order can be necessary. If among the extras there are some for which a written order would have been necessary, we are not aware of it. The case was not tried on that line in the lower court, and such claims, if any there are, are

not specially noted in the briefs. If any such there be, perhaps written orders could have been produced for them, if called for in the lower court.

The main dispute is over the expense of repairing the failures. Of course, responsibility for these expenses follows responsibility for the failures themselves. Hence we pass at once to that question. Plaintiff can be held responsible for the failures only in so far as they appear to have resulted from fault in his work. In that connection we will allude to some general features of the case before coming to the details. Even before mentioning these general features, however, it might be well to give a word of explanation touching the manner of constructing the sewers.

The sewer pipe is laid 12 or more feet underground, and is constructed by joining sections of pipe end to end. These sections are 2½ feet long, and, of course, of the diameter which it is desired the sewer should be of. The section of pipe is of uniform diameter, except at one end, where it flares, or, rather, has a collar, or enlargement, of sufficient inside diameter to admit freely the end of the section of pipe that is to be joined to it. This collar, or enlargement, gives to that end of the pipe, for a space of about five inches, a greater outer diameter of about four inches, or two inches all around. This collar, or enlargement, is called "the bell." The other end of the section of pipe is called "the spigot." And we may add that the space between is called "the barrel." These sections of pipe we shall hereinafter call "pipes." Preparatory to excavating the trench along the bottom of which the sewer is to be laid, sheeting is driven into the ground, and the earth is then removed from between the two lines of sheeting. As the excavating proceeds, a rail, or ranger, is added to each side of the trench, and from the rail on one side of the trench to the rail on the other side of the trench braces are inserted across the trench. The sewer pipe starts from a manhole and ends in a manhole, of which there is one at every cross street. The manhole is an independent construction, and, being of heavy masonry, is always provided with a foundation. The sewer pipe is lighter than the soil it displaces. Hence no foundation is necessary for laying it, unless the bottom of the trench happens to be soft. At about every 30 feet occurs what is called a "tee," by which is meant a section of pipe provided with an opening to serve for making connection with the sewer. The opening in this tee is by means of a neck added to the side of the section of pipe. The tee derives its name from its supposed, or real, resemblance to a capital T. When in position, it is inverted, thus ⊥. The cross of the T forms a continuation of the sewer pipe; and the neck, or leg, of the T, or part through which the sewer connection is to be made, points upward. This leg part is only three or four inches long; that is to say, stands only that much above the barrel of the pipe. The tees are incased in concrete after having been placed in position.

Foremost among the general features mention of which we have thought it well to premise is the fact that, although the main accusation against plaintiff's work is that the spigot end of the pipe was not shoved home into the bell of the pipe to which it had to be joined, yet every one of these pipes had to be laid under the eye of the inspector of the defendant, and the inspectors have testified they did see that the pipes were shoved home. The learned counsel for the defendant says that the inspector was not in the bottom of the trench, and could not see whether or not the pipe was thus shoved home; but, as one of these inspectors very well explains, the spigot end of the pipe is marked with lines which the in-

spector can see from the top of the trench, and from which he can tell whether the pipe has been shoved home or not. Let it be noted that no question is raised as to whether or not the inspectors did their duty, and did it faithfully and well. In a lesser degree, the same thing which is here said of the shoving home of the pipes may be said of the cementing of the joints. The latter work the inspectors did not have so good an opportunity to observe; but it was their duty to observe it as far as they could. They were present for the purpose of doing it, and did do it as far as they could, and they say that, as far as they could observe, it was well done. These inspectors made at the termination of each day's work a minute report of the day's work.

Another of the general features is the fact that 14 months after the first failure on Robertson street had been discovered, and 10 months exactly after it had been repaired, Mr. Earl, the general superintendent of the defendant board, wrote and gave to plaintiff the following letter:

"The Sewerage and Water Board,

"New Orleans, La., July 19, 1905.
"To Whom It may Concern:
"This is to certify that the bearer, Mr. T. J. Shea, has completed one large pipe sewer contract for the sewerage and water board, and is just about completing a second main sewer contract of very considerable magnitude and difficulty, upon which he has been engaged for about two years. Mr. Shea is a thoroughly experienced contractor on sewerage construction, who surrounds himself with an effective organization, and can, I believe, be relied upon to prosecute his work in a competent and business like manner. I believe that he has ample means to handle large contracts, and that he will not undertake or promise more than he can perform.
"[Signed]          George G. Earl,
"Superintendent Sewerage and Water
Board, New Orleans."

No better evidence of the competency of plaintiff and his employés could be desired than this. They had had a thorough test. When this letter was written the second contract, embracing some five miles of sewer, was, in the words of the letter, "just about completing," and the other large contract had been completed, to the entire satisfaction of the defendant. If plaintiff's men were competent to do the work, and had theretofore done good work, the probability is that they continued to do good work, especially as they could have had no motive in not doing good work, since they were paid by the hour. So far as plaintiff himself is concerned, his reputation as a contractor was at stake, and it does not appear in what way he could have profited one cent by the pipes not being shoved home, or by the joints being made badly instead of well. No question can be or is raised with regard to the quality of the material furnished by him.

Another significant general feature is that, when the defendant board itself relaid the sewer at the places where it had sunk, it sank again, the trial judge says at all the places from two to six times. We have verified this statement sufficiently to be able to say that the pipe sank two and three times at most of the places and at one place had to be repaired six times because either of sinking or cracking. The circumstance that the work of plaintiff held firm generally, and that at the places where the pipe sank it sank again, and even repeatedly, when relaid, and even when relaid by the defendant board itself, would go to show that the first sinking was more probably to be attributed to the peculiar nature of the soil at these places than to any defectiveness of the work of plaintiff. In accounting for the repeated sinkings of the sewer when relaid, the defendant has offered evidence to show—what is no doubt to a great extent true—that such repair work is more liable to fail than the original construction; one reason being that the bottom of the trench is not so firm as originally, because at the place where the

pipe has sunk the water has been .attracted and has saturated the soil, and also because the soil at the bottom of the trench has become more or less demoralized, or mucked, by being tramped upon during the original construction, and another reason being that a sewer when laid has to sink more or less in adjusting itself to its position of final rest, and that this inevitable movement is liable to break the joint between the new and the old work. But this feature of the situation is well known, and is met by providing in all repair work a secure and stable foundation. If this foundation itself eventually sinks, .the cause must be sought for, we think, in some peculiarity of the soil at that particular place. Such soft places may occur in any part of the city, and were frequently met with in the construction of the sewers all over the city.

Another significant general feature of the case is that in the laying of the sewers in New Orleans it was expected that for want of a . foundation the sewers would sink in places, no matter how excellently the work might be done, just as it sank on Robertson and Jourdan streets. It was thought better, or more economical, to take the risk of an occasional repair than to incur the, perhaps unnecessary, expense of putting a foundation under the entire line of sewers. This was wise economy; but it ought to go far towards counteracting any inference which might otherwise arise against plaintiff's work from the fact of the sewers having sunk in places.

And along this same line, as tending to counteract any injurious inference that might arise against plaintiff from the work having failed, may be mentioned the fact that, owing to the unstable condition of the soil in the bottom of the trench in many places, plaintiff found himself compelled to back-fill partially the trench before the cement by which the pipes were joined together had time to set. This method of construction exposed the work to failure; so much so that the specifications of the contract expressly provided against it. But the evidence shows that in the soft places this mode had to be followed, or else a foundation put in. It would have been easier for Shea to have done the work by putting in a foundation; but this foundation would have had to be paid for by the defendant board, and could be put in only by permission of its engineers. Shea says he demanded these foundations constantly. The engineers testify that no such requests were made to them. It is not denied, however, that they were made to the inspectors. Some requests for foundation must have been made of the engineers, because in a number of places foundations were authorized by them. On the 16th of May, some time before the sewer had been constructed along most of the places where it afterwards failed, Shea wrote to the general superintendent of the defendant board a strong letter referring to his vain requests in the past for better foundations, and protesting against the laying of the sewers without foundations. In his reply to this letter the general superintendent of defendant did not challenge the statement made in the letter that requests had been made in vain in the past for foundations. The engineers of defendant knew of, and acquiesced in, the partial back-filling of the trench before the cement had had time to set. The evidence shows that the weight of the earth thus prematurely piled upon the sewer pipe had a tendency to cause the pipes to creep, or pull apart, to the extent of causing an opening in the joints.

A significant fact in connection with Palmyra street, where the sewer did not sink but developed longitudinal and more or less uniform cracks along its top, sides, and bottom, is that the mode of construction adopted on that street had never been used before

and was not used afterwards, and that the uniformity of these cracks is most singular unless accounted for by the peculiarity of the mode of construction. The pipe was laid upon a rigid unyielding foundation, and a conduit built of concrete was placed longitudinally a few inches above it, which, the evidence shows, might have had the effect of concentrating upon it the weight of the back-filling.

Defendant, on the other hand, has offered in evidence a statement purporting to have been made from the records of its office to show that, whereas plaintiff, under his contract C, laid 23,747 feet of sewers of all sizes, there was laid under all the other contracts 36,580 feet of sewers 24 inches and over, and that the comparison between this work of other contractors, and that of plaintiff under contract C, stands as follows:

|  | By Other Contractors. | By Plaintiff. |
|---|---|---|
| Per cent. of sewers repaired | 2.4 | 7.8 |
| " " " " laid on foundation | 10.1 | 29.6 |
| Per cent. of sewers laid on foundation repaired | 4.8 | 15.3 |
| Per cent. of sewers laid on soil repaired | 2.2 | 4.9 |
| Per cent. of sewers laid on foundation which had to be repaired on account of cracked pipe | 3.7 | 1.3 |
| Per cent. of sewers laid on natural soil which had to be repaired on account of cracked pipe | 1.6 | 1.5 |
| Per cent. of sewers laid on foundation which had to be repaired on account of settlement | 1.0 | 2.1 |
| Per cent. of sewers laid on natural soil which had to be repaired on account of settlement | 0.5 | 3.4 |

A comparative statement such as this goes for whatever it may be worth; but could be very significant only if the mode of construction and the character of the soil had been the same in the execution of all the contracts; whereas, such was not the case. The mode of construction on Palmyra avenue was not tried elsewhere, and it is a conceded fact in the case that the condition of the soil in a street is no indication of what it will be in the next street, or even perhaps a few feet ahead in the same street. Robertson street may have been exceptionally provided with sand pockets and other dreaded soft places.

We come now to the inquiry into the cause of the failures.

### Palmyra Street.

On Palmyra street 7,000 feet of 30-inch terra cotta pipe was laid. Some time after the work had been completed, longitudinal cracks, more or less uniform in character, were discovered along the top, sides, and bottom of the pipe. These were not all in one stretch, but at different places. They aggregated 848 feet.

The manner of the construction was this: The pipe was laid on a rigid, unyielding foundation consisting of thick wooden sills and boards, securely braced, upon which was placed a six-inch layer of shells. Above the pipe, along its entire length, six inches from the barrel part of the pipe and two inches from the bell part, and resting directly upon the tee, was laid a conduit of concrete, 18x18 inches in diameter.

When the trench was reopened for repair, it was found that for a distance of 125 feet the concrete conduit rested on the wooden pieces laid across the trench for bracing, the sheeting, and that these crosspieces, or braces, rested directly upon the sewer pipe, and that for this entire stretch of 125 feet the pipe was cracked longitudinally along its four sides, in the manner already described.

So far as this stretch of 125 feet is concerned, there is no difference of opinion as to what was the cause of the cracks. It was the fact of the crosspieces resting upon the pipe, with the concrete conduit resting upon the crosspieces, whereby the weight of the back-filling was concentrated upon the pipe. The

responsibility, then, for the cracks along this 125 feet, depends upon the responsibility for the braces being thus on the pipe and the conduit upon the braces. Plaintiff's foreman, Mulcahey, and defendant's inspector, McHugh, testify positively that the work was done in that manner in obedience to the express instructions of Mr. Eastwood, the engineer in charge. In the brief for defendant it is said that Engineers Eastwood and Fowler deny this. We have not found where Fowler testified on the subject.

Defendant attributed the cracks at the other places to the failure of plaintiff's workmen to tamp and pack the earth under the haunches, or lower sides, of the pipe, up to its spring line, or middle, so as to afford it proper support; and also to the failure of plaintiff's workmen to make the joints properly, so that the earth under the pipe, which should have served as a support to it, was washed into it. Defendant further contends that this defective condition was made worse by the presence of stumps, roots, and other pieces of wood in the back-filling, which foreign substances came in contact with the pipe and had the effect of producing an uneven strain. Plaintiff, as already stated, attributed them to the peculiarity of the construction—the fragile terra cotta pipe placed between the rigid, unyielding foundation and the concrete conduit with its load of back-filling—between the jaws of a vise, as it were.

We are not informed whether longitudinal cracks of this kind were found at any other places in the more than 175 miles of sewers that were laid in New Orleans except on Broadway street, where the sewer had been laid with a concrete duct above it as on Palmyra.

On Robertson street, between Touro and Frenchman, at station 47+3 to station 57+7, where there was a foundation under the pipe and a piece of wood was resting along the top of pipes 13 to 17, and the cross-brace rested upon this piece of wood, the said pipes 13 and 17, under this piece of wood, were found to have cracked in the same longitudinal fashion.

Mayor B. M. Harrod testified as follows:

"Q. Suppose the concrete duct was separated from the bell of the pipe by only 2 inches of soft new earth, and then had to support 12 feet of earth?
"A. The pressure of the earth above would be transmitted to the earth below, so that the pressure would be transmitted to the pipe. It would be a mistake to place it within 2 inches of the pipe."

Mr. Ludlow testified as follows:

"Q. What is the effect of introducing into the back-filling foreign material of substances at or near the pipe?
"A. I think the danger would be of concentrating the load at some particular point of the pipe, instead of having it uniformly distributed.
"Q. Then it is not true that it is not good, proper workmanship or design to permit, in the back-filling of the trench, the introduction of material that will concentrate the load on any part of the pipe?
"A. I think it is objectionable; yes, sir.
"Q. It is objectionable?
"A. Yes, sir.
"Q. It is liable, in your opinion, to bring disaster to that sewer?
"A. It will be apt to, it may or may not, it will be apt to."

Mayor Harrod and Mr. Ludlow were called by defendant. The expert of plaintiff, Mr. Potter, testified to the same effect. The other experts of defendant testified that a thin cushion of earth between the concrete conduit and the pipe would suffice to protect the pipe, that it would distribute the pressure and dissipate it in the surrounding earth, that for this purpose a cushion of two inches would be ample, and that a cushion of half an inch would answer just as well. One of these experts went so far as to say that a cushion of earth as thin as a sheet of paper would suffice. The opinion expressed by Mayor Harrod accords best with our sense of the matter.

We cannot say that the earth was not properly tamped or packed under the haunch-

es of the pipe. The foreman who was in charge of the work for plaintiff testifies that it was, and defendant has offered no proof to the contrary. The work was done under the supervision of defendant's inspectors. If we are to find that plaintiff's work was defective in the respect in question, we shall have to do it purely as a matter of inference from the fact that the pipe was cracked. This inference would be legitimate if the cracks could be explained on no other hypothesis; but they can be and are fully explained on the hypothesis suggested by plaintiff.

The testimony of the witness Godberry to the effect that when the trench was reopened for repair a quantity of roots and pieces of stumps were found over and around the pipe; and the testimony of the witness McConnell that "the excavation around the pipe was full of roots," does not necessarily contradict the testimony of plaintiff's foreman to the effect that the earth was carefully tamped and packed under the haunches of the pipe. It was on Villere street, and not on Palmyra street, that "a piece of timber 2x8x4 feet was found resting on the pipe." Defendant would hardly contend that in back-filling the trench it was incumbent on the contractor to remove from the back-filling material every piece of root or stump that might be in it. While the expert evidence shows that pieces of wood, or other unyielding or incompressible material, resting on the pipe, might have the effect of causing a crack by concentrating the weight of the back-filling and inducing an unbalanced strain, it also shows that any cracks thus produced would likely have been irregular, or star-shaped, or radial, while those whose cause is being sought after were singularly regular.

We have concluded that the cracks were due to the pressure of the duct over the pipe, and that the responsibility lies with defendant.

Defendant's learned counsel argues that, inasmuch as both the foundation and the conduit were uniform throughout, the cracks would have extended the entire length of the sewer if they had been caused by the conduit, on the principle that like cause produces like effect. This argument would be unanswerable if the foundation and the conduit were the sole conditions; but there are others. There is the soil under the haunches of the pipe which, although it may have received an equal amount of tamping, yet from its character may have offered more support in some places than in others. There is the pipe, which may have been stronger in some places than others. There is the back-filling, whose weight may have been more directly concentrated upon the conduit in some places than in others.

The suggestion that on Villere street the pipe did not crack, although a duct was laid above it as on Palmyra, would have force if on Villere, as on Palmyra, the pipe had been laid upon an unyielding foundation; but it was laid upon the natural soil, into which it could sink under the pressure. On Palmyra, after whatever resistance the soil under the haunches of the pipe could offer had been overborne, the pipe found itself between two unyielding or incompressible bodies, and had either to sustain the weight or be crushed.

The learned judge a quo did not believe, nor do we believe, the testimony of the defendant's witness Hardy as to joints having been made of clay.

We discover no great significance in the fact, if it be a fact, that, when the broken pipe was taken out and a new pipe put in, a few inches more of pipe was put in than had been taken out; going to show that in plaintiff's work the pipes had not been shoved home. It is not suggested how this could

have contributed to the cracking of the pipe. Whatever interstices were thus left were filled by the cement with which the joints were made. Defendant's witness who testifies to this additional length of pipe having had to be put in somewhat overshoots the mark when he makes out that every joint fell short about an inch of being shoved home. The learned counsel for defendant does not himself seem to have had great confidence in the statements of this witness on this subject, as he did not refer the court to the more exaggerated of these statements.

### Jourdan Avenue.

On Jourdan avenue the pipe sank in two places, both of them between St. Claude and Rampart streets. At one of these places—the one, between stations 1+35 & 1+41—the sinking is attributed by plaintiff to the fact that at that place the wooden foundation was dispensed with for a space of 6 feet, and it is attributed by defendant to a leak which it is said permitted the earth under and around the pipe to be washed into the pipe. The proof is that this leak ran clear water, and that it was caulked with oakum, and nothing shows that it afterwards reappeared. On the other hand, the absence of foundation is an obvious cause of the sinking of the pipe. Defendant criticises the testimony going to show that the leaving out of this foundation was by order of the engineers; but this testimony was not contradicted by the two engineers in question, though they testified minutely upon other points. We conclude that responsibility for this failure cannot be laid on plaintiff.

At the other place, at about station 2+45, the conditions were normal. The bottom of the trench was of hard blue clay, affording a good foundation, and no engineering error can possibly be assigned; whereas, on the other hand, it is shown that shortly after the laying of the pipe plaintiff piled up a quantity of earth at that spot, and that this may well have caused the subsidence. For the latter failure plaintiff is, we think, responsible.

### Robertson Street.

The sewer sank on Robertson street at eight places. These are known in the record as: Trench AA and trench A, between Touro and Frenchman streets; trench B and trench C, between Frenchman street and Elysian Fields; trench D, between Elysian Fields and Marigny; trench upper E and trench lower E, on each side of the manhole at the intersection of Marigny street; and, finally, trench between Mandeville and Spain.

We shall take up and consider these several failures in regular order.

Trench AA: This trench began 143 feet from the manhole at corner of Touro and Robertson, and extended 43 feet towards Frenchman street. On original construction, when the sewer had been completed to the manhole at corner Frenchman street, Barangue, the inspector, on looking back into the sewer from this manhole, discovered that the sewer had sunk. This was on or about April 16, 1904. As to what had caused this failure, there is not one word of evidence in the record, except the conflicting evidence as to whether the soil at the bottom of the trench had been of such a character as to have afforded the pipe sufficient support if the work had been done well. If we take the report of the inspector, Barangue, we find the following:

"Trench open from station 1+00 to 1+90 [which means beginning 100 feet from the manhole at Touro street and extending 90 feet towards Frenchman street, which would cover the stretch now known as trench AA]. Bottom beginning to show traces of quicksand and water. And indications are will have to use plank bottom from now on."

The same report shows that along this stretch only 17 feet of sewer was laid in one day of 10 hours, and only 25 on the next

day, also 10 hours; · whereas, on the following day of 10 hours, when pipe was being laid on a bottom which, according to the same report, was of "hard blue clay," 41 feet was laid. This would go to show that along this stretch of quicksand and water the pipe was being laid with great difficulty.

On the other hand, defendant's learned counsel argues that second sheeting and a sandy or soft bottom of trench go hand in hand, and that no second sheeting was found to be necessary on Robertson street, that the first sheeting stops several feet short of the bottom of the trench, and leaves the sides of the trench unsupported from there down to the bottom, and that these sides, thus· unsupported, would inevitably have caved in, if the bottom had been so sandy or soft as not to have been firm enough to support the pipe.

Generally speaking, what is here said is true; but the evidence shows that the thickness of a few inches of clay will suffice to keep down the sand and water and afford a foundation, and that where such a condition was encountered the bottom would continue good until the cradle for the body of the pipe was being made by digging further down, or even until the "bell hole," or cradle for the bell part of the pipe, was being dug, when the stratum of clay would be punctured, and the sand and water would come out. "When I would dig my shovel down," says the colored pipe layer Gordon, "the water would come up just the same as stabbing a hog."

It is also a fact that, in places where the bottom was so bad that the engineers authorized a foundation to be used, the sides of the trench remained in position without second sheeting until the time came to lay the foundation, when second sheeting was put in.

This first failure was repaired by Shea, June 24–September 19, 1904. This time a foundation was put in; but some time afterwards the discovery was made that both

124 LA.—11

foundation and pipe had gone down, the foundation 32 inches further down than the pipe, and that even ·the upright sheeting had gone down. This second failure would go 'to confirm the conclusion that the first had been attributable to the insecure character of the soil, and not to bad workmanship.

But defendant contends that this second failure at trench AA was due to bad workmanship, and, in. proof thereof, points to the fact that, when the trench was .opened the second time, and the repair work was exposed to view, a piece of timber 6x6 was found jammed between the sheeting and the sewer at pipe 20, and another at pipe 13: and that another piece 2x6x16 feet long was found lying along the top of the sewer, over pipes 13 to 19, and was braced down by a horizontal piece 4x6 lying crosswise of it, and by two uprights; and that a brickbat was found jammed between the sheeting and pipe 11; and three pieces of sheeting were found pressed against pipe 12; and that pipes 13 to 17 were cracked on one side.

All of these irregularities, except the presence of the piece of board 2x6x16 lying on the top of pipes 13 to 19, may have been the result of the disturbance and displacement caused by the sinking of the work. We think it is much more probable that this second failure was caused by instability of the soil at this place than by the piece of timber on the top of the pipe.

The presence of the piece of board along the top of the pipe may have caused, and, in fact, probably did cause, the crack on the side of pipes 13 to 17; but it is not shown that this crack contributed to the sinking of · the work, which was the main ˙ or serious, · damage.

So much for trench AA. Trench A was in the same square between Touro and Frenchman. It began 265 feet from Touro and extended 83 feet in the direction of Frenchman; that is to say, it was just before reach-

ing the manhole at corner of Robertson and Frenchman. On arriving at this place, in the course of the original construction, Shea had refused to proceed with the work unless he was allowed to put in a foundation, and one of the engineers of the defendant had come and examined the spot and decided that a foundation was not necessary, and had ordered the work to go on.

For the 10 feet of trench opened April 8th, being the 10 feet beyond the 300 feet point from Touro street, this being the place where the sewer sank, the report of Barangue, the inspector, reads as follows:

"Bottom showing slight traces of quicksand and water. Bailing out same satisfactorily, and think will have to use planking bottom, if conditions change for the worse. Am nearing the corner Frenchman and indications show quicksand traces."

The report of the next day, April 9th, reads as follows:

"Considerable seepage occasioning much delay on account of bailing out by buckets. Bottom good so far."

The 10th was Sunday. On the 11th no report of bottom. On the 12th report reads as follows:

"Considerable natural seepage. Compelled to use hand pump. Bottom not as bad as expected."

Report of 13th as follows:

"Considerable difficulty experienced to-day in laying pipe on account of watery bottom. Quicksand bottom just below grade and water boiling up compelling use of hand pump. Otherwise work progressing nicely."

Report of next day shows good bottom of blue clay.

On the 13th, when there was "considerable difficulty experienced in laying pipe on account of water bottom and quicksand bottom just below grade, and water boiling," there was laid 31 feet of pipe, from station 3+07 to station 3+38; that is to say, within the stretch now known as trench A.

We conclude that the cause of the failure at this place was the unstable character of the soil, and not any bad work by plaintiff.

To prove the bad workmanship at this trench A and at trenches B and C, defendant has introduced in evidence pieces of pipe purporting to be pieces of the pipe taken out of the trenches when the pipe was being repaired. These samples were offered for the double purpose of showing that the spigot end of the pipes had not been shoved home into the bell of the pipes they connected with, and that the joints had not been properly cemented. The former purpose was expressly abandoned by counsel for defendant, who, towards the end of the trial, said:

By Mr. Villere:

"Q. Yes, yes. Now, Mr. Potter, about this gasket and other things—I am going to stop right there, because, in my opinion, it is not important, as my theory really is the same as yours. I believe that all those pipes were originally shoved home. I believe that they subsequently pulled out, and then I believe that then the space was filled in with cement. That is your opinion, isn't it?

"A. Unquestionably.

"Q. Yes?

"A. And that that pulling out took place at various times."

It is attempted to be shown by one of the samples that one of the joints was not cemented at all. Such a thing as that the joints were imperfectly cemented is entirely possible; but such a thing as that one of the joints was not cemented at all is so utterly improbable that we should believe it only if the evidence in that regard was so conclusive as to exclude all possibility of doubt. How could such a thing be? These pipes are 30 inches in diameter, and weigh 360 pounds. The putting in of each one of them is a large piece of work. It requires the co-operation of several men. The foreman and the inspector are looking on. The cementing of the joint is one of the main parts of the work. Only inadvertence could account for its not being done, and, under the circumstances just detailed, such inadvertence would seem to be next to impossible. If the samples produced

by the defendant are really pieces of the sewer that was laid by Shea and afterwards taken out by the defendant board, it is unfortunate for defendant that they were not taken out contradictorily with Shea, as was done in the case of the samples of earth. There would then have been no doubt as to their genuineness. We agree with the learned trial judge that two of them are pretty conclusively shown to be spurious; and that the others, if genuine, show nothing more than that the pipes pulled, or crept, apart after having been laid—a thing which the evidence shows is likely to be brought about by the trench being back-filled before the cement in the joints has had time to set firmly.

Passing to trenches B and C. These trenches were between Frenchman and Elysian Fields streets. The sewer sank in trench B between stations 1+70. In trench C it was between station 2+77 to station 2+98. Eventually the intervening space between the two trenches was dug, and the two trenches were connected and made one, extending from station 0+83 to station 3+; that is to say, it began 83 feet from the manhole at the intersection of Frenchman and Robertson streets and extended to a point 300 feet from that manhole towards the manhole at the intersection of Robertson and Elysian Fields streets.

We find no evidence specially relating to the character of the soil at the bottom of this trench, except the daily report of Barangue, the inspector. We find from these reports that from station 0+69 to station 2+27 —that is to say, beginning 49 feet before reaching the place where the sewer failed at trench B and extending 57 feet beyond that point—the soil at the bottom of the trench was hard blue clay affording a good foundation for the sewer.

We find no reason for holding that the failure at trench B was from the instability of the soil at the bottom of the trench, and we

must therefore attribute it to a defect of some kind in the work of plaintiff.

From these same reports of Barangue we find that the soil was equally good, hard blue clay, along the bottom of trench C, except between stations 2+60 and 3+20, as to which the report reads:

"Looks soft, and will have to double sheet and plank bottom."

At this bad spot an artificial foundation was put under the sewer, and when the trench was reopened for repair no sinking was found to have taken place along where this foundation had been laid. Some of the joints, however, were found to have been imperfectly made.

Upon the evidence as a whole, we think the greater probability is that the failure at this point was not due to lack of foundation.

Plaintiff's learned counsel says a sewer must settle more or less in adjusting itself to its position of final rest, and that uniformity in this settlement is a prime object, as, otherwise, the pipe runs the risk of disruption by an uneven settlement, and that therefore, whenever an artificial foundation is provided, it ought to extend, like the pipe itself, from manhole to manhole, and not be put in by dabs here and there for bridging or getting across the places which prove too soft to admit of the pipe being laid on the natural soil. This is in a large measure true, but not to the extent claimed. In the 200 miles of sewer laid by the defendant board, this mode of construction was followed successfully in any number of such soft spots. This, and the very fact that it was persisted in, would go to show that with proper precautions it could be safely followed. We note, also, that the pipe was laid at this trench C after the trench had been flooded for two days by water coming from the manhole at Frenchman street, for the presence of which water the defendant board was responsible; but the evidence does not

show that this water destroyed or impaired the stability of the bottom of the trench where a foundation was not used, or that Shea asked to be allowed to extend the artificial foundation any further than was done.

We find, on the other hand, that at station 2+90, within the stretch of this trench and right over the spot where the pipe sank, Shea piled earth over the sewer to the height of nine feet above the level of the street; and the evidence goes to show that the placing of this additional weight over the newly laid sewer might well have had the effect of causing it to sink.

Coming to trench D, all that need be said of it is that it is the trench that failed so repeatedly, six or more times, when repaired by the defendant board itself. There must have been something in the character of the soil along this stretch which made failure inevitable unless extraordinary precautions in the way of providing a stable foundation were taken; and before this trench D was reached Shea had already, by his letter of May 16th, protested against being made to lay sewers on soil such as he occasionally encountered on this Robertson street, unless an adequate foundation was provided.

Coming to trench upper E and lower E, we find that there can be no serious dispute but that the cause of the trouble was the sinking of the manhole and its taking the pipe down with it. What caused the manhole to sink is the question. No defect of construction is shown in the manhole. On the other hand, the soil was to all appearances good at the spot over which it was built. Defendant's learned counsel insists that there must have been defects in the neighboring pipe joints which permitted the soil to enter the sewer and thus gradually draw away the soil from under the manhole. We do not think plaintiff can be condemned on an abstract reasoning like this. If he did his work well, he is not responsible for consequences. If the soil on which these sewers were laid was not known to be unreliable, the fact itself of the failure would prove the work to have been defective; but this known unreliability of the soil offers an explanation for this otherwise apparently inexplicable failure, and we have concluded to adopt it. The testimony of one of defendant's engineers that, unless a manhole sinks within a few days of its construction, it does not sink thereafter as the result of the peculiar character of the soil under it, is contrary to the common experience of mankind with reference to heavy constructions upon alluvial soil. These manholes are of brick masonry, and would inevitably sink without a foundation, and that one of them should sink, and thereafter continue to sink, even with its foundation, would be nothing to be wondered at.

Trench between Mandeville and Spain: We are not referred, in the remarkably full, and, we may add, masterly, brief of the counsel for defendant, to anything upon which this court could found itself for reversing the judgment of the lower court in the matter of this trench.

This concludes our discussion of the details of the failures. We will add that, when the trenches were reopened for repairs, samples of the soil were taken and were preserved in glass jars. These samples were submitted to experts for an opinion as to whether the material was of sufficient consistency to support the sewer unaided by an artificial foundation. This was after the earth had had time to settle in the jars. All this opinion evidence, and the opinion evidence generally as to the causes of the failures, has impressed this court, as it did the learned trial judge. Except that it has afforded some general scientific information as to which there is no difference of opin-

ion, it has not helped the court one particle; and, in the present connection, we might as well dispose here of the contention that the judgment of the defendant's general superintendent is conclusive as to the cause of the failure of the sewers. That contention is based upon the following clauses of the contract:

"Sec. 223. The sewerage and water board shall have the right to appoint its general superintendent or engineers, also assistant engineers and such other employés as are necessary to the proper conduct and inspection of the work and all materials. All explanations or directions necessary for carrying out and completing satisfactorily the different descriptions of work contemplated and provided for under this contract will be given by said engineer, and the general superintendent will finally decide all matters of dispute involving the character of the work, its quantity, and the compensation therefor."

"Sec. 264. It is further agreed that when, in the opinion of the engineer, this contract shall be completely performed on the part of the contractor, the engineer will proceed to take final measurements and estimates of the cost of the work, and will render a certificate of the same to the sewerage and water board, who will, except for cause herein specified, pay the contractor, on or before the fifteenth day of the following month, the balance which shall be due. * *

There can be no question but that a clause of this kind is valid and must be enforced as written. Martinsburg & Potomac R. R. v. March, 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. Ed. 255; Ogden et al. v. United States, 60 Fed. 725, 9 C. C. A. 251; Kihlberg v. U. S., 97 U. S. 398, 24 L. Ed. 1106; Sweeney v. U. S., 109 U. S. 618, 3 Sup. Ct. 344, 27 L. Ed. 1053; Railroad Co. v. March, 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. Ed. 255; Railroad Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290, 34 L. Ed. 917; Railroad Co. v. Central Lumber Co., 95 Tenn. 544, 32 S. W. 635; Hot Springs Ry. Co. v. Maher, 48 Ark. 522, 3 S. W. 639; Guild v. Andrews, 137 Fed. 369, 70 C. C. A. 49.

We do not understand, however, that plaintiff is refusing to let the defendant's engineer pass upon the character of his work in so far as the character of his work is known, but that he only refuses to admit that the defendant's engineer can be allowed to attribute to his work a character it does not possess. For instance, to establish, by his ipse dixit, that cement was not put into certain joints, or that certain pipes were not shoved home, etc., etc., when, in point of fact, cement was put in the said joints and the said pipes were shoved home or that the said engineer can decide that a certain failure was caused by a certain leak which was 50 feet away, and had nothing to do with the failure, and that such judgment shall be conclusive. As we understand those clauses, they mean no more than that the engineer is to be the judge of the manner in which the work should be done in order that it should be in compliance with the specifications, and is to have the right to condemn all work not coming up to that standard. The moment it is established that the cause of a failure was not defective workmanship, but instability of soil, the judgment of defendant's general superintendent, if contrary to the proven facts, ceases to have any authority.

### Proof of Plaintiff's Demand.

Coming to the consideration of the items which compose the demand of plaintiff, and of the character of evidence and degree of proof which ought to be required of plaintiff, we find that defendant would hold plaintiff to the same strictness of proof as if the case involved but one item and were a mere ordinary case of a plaintiff suing on an open account; but, manifestly, that view cannot be accepted. On that theory the trial of the case, which occupied the lower court some eight months, 128 actual trial days, would have occupied it 8 years. The plaintiff, the members of the defendant board, the judge, the lawyers, and the witnesses would all have had time to die before the evidence could have been taken. As matters stand, the case

has monopolized the time of the courts far beyond all reasonable limits. By express terms of the contract the defendant was entitled to have its inspector keep an account of every hour of labor and every piece of material that went into the work, and such an account was kept, and a daily report made of it to defendant, and defendant has these reports in its possession. By means of these reports and of the other data in its office, the defendant could have put its finger upon every cent of overcharge, if any, contained in the exhibits presented by plaintiff. These exhibits are models of clearness and precision. They are easily intelligible even to the nonexpert. They show exactly what every cent is charged for. As a matter of fact, the engineer of plaintiff and the engineers of the defendant board went over these exhibits together and agreed as to most of the items, and have on the witness stand given the reasons why they disagreed as to the others. With respect to the admissibility in evidence of summaries, or compilations, such as these exhibits, the law is stated by Wigmore, as follows:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very numerous detailed statements— as, the net balance result from a year's vouchers of a treasurer or a year's accounts in a bank ledger—it is obvious that it would often be practically out of the question to apply to the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net results. Such a practice is well established to be proper. Most courts require, as a condition that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in the court, or at least be made accessible to the opposing party in order that the material for cross-examination may be available." Wigmore, Ev. par. 1230, p. 1473.

See, also, Greenleaf, Ev. (16th Ed.) vol. 1, p. 690; State v. Mathis, 106 La. 263, 30 South. 834.

The requirement that the "mass" or data from which such a compilation has been made should be offered in evidence has been complied with in this case. The said data consist of the reports of plaintiff's foremen on the work, of the notes and calculations of measurements made by the engineer of plaintiff, and of the sheets of defendant's monthly estimates. Only in a few unimportant instances are the compilations not based upon the data in the record. Of these foremen's reports alone there are 2,730. Of the estimates there are 47 large sheets covered with small figures, the labor of going through which would be simply stupendous. Of the other data, there is a large number of bound volumes. Of course, the rule is that a litigant's books are not admissible in evidence in his favor; but that rule is not without its exceptions. 16 Cyc. 926; 17 Cyc. 366, 391, 393, 755; Cent. Dig. vol. 20, pp. 2018–2034; Wigmore, vol. 2, p. 1517; Louisville & Nashville R. R. v. Daniels, 122 Ky. 256, 91 S. W. 691, 3 L. R. A. (N. S.) 1190. All these reports, etc., were made at a time unsuspicious, and for the purpose of keeping a true and correct record. We think that, under the peculiar circumstances of this case, and in view of the practical impossibility of trying the case in any other way, the court can accept the said exhibits as correct, except as to the items specially objected to; and the trial court is, accordingly, directed so to do. The items specially objected to, we now proceed to consider and pass on, in so far as the condition of the record will permit.

The principal of these objections is that as to the measurement of the work, or, in other words, as to its "quantity, and the compensation therefor." We do not well understand how plaintiff can raise any contention in that connection when section 223 of the contract, hereinabove transcribed, expressly provides that the general superintendent of

the defendant board "shall finally decide all matters of dispute involving the character of the work, its quantity, and the compensation therefor." The authorities hereinabove quoted show that such a clause as this in a contract is binding, and that a decision under it is conclusive, in the absence of a showing that it was made in fraud or bad faith ; and the plaintiff has not made such a showing, but has contented himself with setting up the measurements and computations made by his engineer against those made by the engineer of the defendant board. We have no hesitation whatever in holding that, under the plain terms of the contract, the measurements made by the defendant board must prevail. We shall notice, nevertheless, some specific cases discussed in the briefs

Concrete at canal crossing: One of defendant's engineers testifies that the allowances made under this head by the estimate of the defendant board are founded upon measurements made by himself, and are correct. Against this, plaintiff had offered no evidence.

Measurements of material in foundation under sewer: For measuring the length of the foundation under the sewer, plaintiff wishes to measure from center of manhole to center of manhole. In this way plaintiff would include in the foundation under the sewer the foundation under the manhole. This foundation under the manhole is seven feet. Plaintiff has already been paid for it as part of the manhole. So that for this seven feet plaintiff would get paid twice if his mode of computation were adopted.

Depth of cut in trench on Burgundy street, between Renes and Forstall: The estimate of the defendant board is based upon an actual measurement made on the work, and is therefore more reliable than that of plaintiff's engineer, which is based on profiles made two years before from merely approximate measurements.

Extra brickwork in manholes: A thickness of eight inches is called for by the plans and specifications, and the actual thickness was verified by defendant's engineer.

Computation of extra excavation for manhole: Defendant's mode of computation, as explained in volume 3 of Ev. pp. 1458 and 1459, appears to us to be entirely reasonable. Plaintiff's mode of computation is not explained.

Depth of trench on Palmyra street and average cut across St. Roch avenue. Here, again, plaintiff's engineer based himself on the profile maps made from approximate surveys dating two years before the work was begun; whereas, for making the same computation, defendant's engineer based himself upon levels taken at the time the work was being done and at every 16 feet.

Computation of depth of manholes: We agree with defendant that the depth of the manhole is to be computed from the top, and not from the bottom, of the plank foundation. Section 14 of the specifications expressly so provides.

Capping and decking: In other words, should the lumber in the foundation of sewer on Palmyra street be charged at $18 per 1,000, or at $30. The facts in that connection are fully stated in the opinion of the learned judge a quo, and need not be repeated here. For the reasons there given, we are of the opinion that this lumber should be charged at the higher price, and such higher price is allowed.

Second sheeting left in trench: We agree with defendant that this lumber should be classed as "sheeting and bracing," under section 52 of specifications, and not as "foundation lumber."

Top sheeting in trench from station 15 to Broad street: This sheeting was to overcome a difficulty met with by plaintiff in the course of his work, the expense of which therefore clearly falls upon him.

Drop pipes in manholes: The contract expressly provides that the cost of these drop pipes is to be included in the lump price paid for the manhole. Plaintiff, therefore, is not entitled to charge extra for them.

Manholes at Lafayette and Villere streets and at Robertson and Frenchman: Plaintiff is, of course, not entitled to be paid for these manholes, which were not constructed by him, but by another contractor under another contract.

Five yards of gravel on Robertson, between Marigny and Mandeville: No proof that such gravel was put in. The claim for it is disallowed.

Standpipes on Robertson and Villere streets: Allowed to the amount shown by comparative statement to have been heretofore allowed by estimate of defendant board.

We now proceed to take up and consider, in regular order, item by item, Plaintiff's Exhibits B to P, which set forth in detail the items for the so-called "extra work."

### Exhibit B.

April 11. Terra cotta pipe............ $2.83

Disallowed, under sections 100 and 101.

April 12. Draining Sisters' street..... $55.64

Disallowed. This pond was there when the letting of the contract was advertised, and was one of the difficulties to be overcome by the contractor.

June 1–6. Men and machine kept in idleness through fault of defendant board........ $559.48

Allowed. We think the defendant was at fault, and that the evidence shows the account to be correct.

June 9, 10. Change radius of curve, Villere and Sisters' streets .............. $213.05

Allowed for $50.28. Balance disallowed on testimony of Burns that machine and men went on working and no time was lost. Shea does not say that he was present on work and saw men idle.

June 20. Material and labor, making center of crown, brick sewer. Sisters' and Marais streets ................... $7.47

Allowed. The form had to be remodeled, and the cost was as here stated.

June 27. Culvert of Villere and Bartholomew ............... $21.07

Allowed for $10.53, on testimony of Smythe. Disallowed as to remainder.

June 27. Culverts, Villere and Independence ............... $23.55
Villere and Louisa $59.83

Allowed for $16.77 and $29.22 on testimony of Smythe and Crotts. Disallowed as to remainder.

Aug. 25. Repairs to Convent road.... $23.92

Disallowed. Not ordered by defendant board; merely for convenience of plaintiff.

Oct. 11. Culvert, Villere and Poland... $9.88

Allowed.

Oct. 23–30. Cleaning out and repairing settlement cracks, Villere between Louisa and Piety............ $110.69
Same ................,..... $107.43

Allowed. The work became necessary without the fault of plaintiff, and he was ordered to do it. The amount is proved.

Nov. 14. Pointing and plastering sewer ..................... $549.52

Disallowed. This work seems to have been made necessary by the condition in which sewers were left. The projections of cement, and the cement dropped by the workmen, not having been removed while fresh. The expense falls upon the contractor, under sections 135, 254, and 256 of the contract, requiring the brickwork to be left smooth.

April 14–27. Lumber used in forms for concrete ............. $31.30

Disallowed. Lumber used in making the forms for the masonry work is necessarily included in the price paid for the masonry work.

April 27. Forty and eight-tenths cubic yards back-filling and rolled steel and corrugated bars, $12.45, $10.08, and $20.40 ................... $42.93

Allowed; but must be disallowed if already credited to plaintiff in general estimate—a fact which this court has been unable to verify, but which the lower court will have to verify before disposing finally of this item.

### Exhibit D.

April 17, 19. Bottom in foundation to manhole, Rocheblave and Palmyra streets.. $145.69

Allowed for $80.24. According to the testimony of Godberry, the inspector, the work of the 17th was original work under the contract, and not extra work. Hence the $103.70 charged for that day cannot be allowed. That sum being deducted, the amount of $80.24, admitted by defendant, is even more than the amount due.

Nov. 10, 11. Diverting drainage, Hagan Avenue Canal..... $22.58

Allowed. This amount was expended in diverting water brought upon the work of plaintiff as the result of other work which was let to other contractors after the contract with plaintiff had been entered into.

Nov. 23, 24. Crossing Hagan avenue. Setting forms for concrete to protect sewer and conduits.......... $ 9.20
          Same ................ $14.58
Dec. 5.   Same .,.............. $14.15
Feby. 27. Moving forms concrete Palmyra and Carrollton avenue .............. $12.62

Disallowed. The price for concrete work included the making and placing of the forms necessary for doing the work.

We come now to a series of items falling under general title of "Irwin water." Water from the Irwin sewers came upon the works of plaintiff and caused him expenses he would not otherwise have had. We think the defendant board is clearly responsible for these expenses, and it practically acknowledged it by agreeing to pay plaintiff at the rate of $10 per day not to exceed 100 days for the expenses of pumping this water. Defendant relies upon this agreement as a compromise, and says that the agreement was to accept $1,000 in full of all claims. We do not so understand the compromise. In the first place, it related exclusively to expenses incurred for pumping, and it looked to the future, and did not cover expenses incurred in the past. It specified a separate payment for expenses incurred in the past for watchmen, but said nothing about expenses otherwise incurred. We shall allow the claims bearing date before the compromise in so far as proved, and also, in so far as proved, those subsequent to the compromise for expenses other than for pumping, and shall disallow all the others, but in lieu thereof shall allow plaintiff $1,000, or $10 a day for 100 days, for pumping.

Dec. 8, 23. Irwin water. Extra expenses pumping, etc..... $635.22

Allowed, as previous to compromise.

Feby. 7. Irwin water. Labor transferring and placing pump on Palmyra St., to relieve sewer of water discharged by sewer of contract L..... $98.96

Disallowed, as included in compromise.

Mch. 8, 10, 30. Irwin water. Material, pipe and fittings, used for discharge of steam pump, Palmyra and Rocheblave streets on account of excess water from contract L. $82.11

Disallowed, as included in compromise.

March 31. Irwin water. To expense of pump and boiler, etc. $280.00

Disallowed, as included in compromise.

March 8. Irwin water. To expense cleaning out sewer, etc..... $79.07

Allowed; the defendant board having been responsible for the presence of the water which necessitated this expense, and the compromise having had reference only to pumping, and not to expenses for other work.

April 30, 6. Irwin water. To operating engine, etc....... $300.00

Disallowed, as included in compromise.

May 31. Irwin water. Pumping water, etc.................. $310.00

Disallowed, as included in compromise.

June 30. Irwin water. Operating pump, etc.............. $145.00
June 30. Irwin water. Operating pump, etc.............. $140.00

Both these items disallowed, as included in compromise.

March 8. Labor removing sheeting, etc. $12.77

Allowed. The charge is not for the sheeting, but for cutting it in obedience to orders. This cutting plaintiff was not by his contract bound to do.

April 7. Labor and material, etc...... $15.64

Disallowed on testimony of McBridge and Crotts.

April 13. Repairs to curbing, etc..... $165.78

Allowed. Defendant allows for the materials used in this work, but not for the labor. We think that if sections 217 and 218 have no application to the lumber, neither have they to the labor.

May 29. Cutting off sheeting, etc..... $10.46

Allowed. The bill is not for the sheeting, but for cutting it off—a work plaintiff was not bound to do under his contract.

June 12. Repairs to overhead wires.... $7.02

Disallowed. This was one of the difficulties plaintiff had to overcome in his work.

July 1–11. Bridge crossing Broad street ................ $104.88

Allowed for $58.75, unless already credited. Disallowed for balance under section 196.

July 31. Culvert, Palmyra, etc........ $8.58

Disallowed, on testimony of Crotts.

Nov. 27–Dec. 8. Curbing, etc........ $35.62

Allowed. If section 217 did not apply to materials, it did not apply to labor.

Exhibit E.

Aug. 3, 1905. Moving steam pump... $112.81

Disallowed. The pumping is not shown to have been by order of the defendant board, nor is the defendant board shown to have had anything to do with it. The necessity for it seems to have resulted from a certain sluice gate having been left shut, for which, from the testimony of Anderson, plaintiff himself seems to have been responsible. The work is shown to have been a part of the work of cleaning the sewer, the expense of which falls upon plaintiff. Plaintiff might have testified on the subject and did not.

Sept. 11–Oct. 31. Materials and labor St. Bernard Ave. brick sewer...... $ 66.42
Pointing, finishing, etc. ........... $390.03
Nov. 13–29. Plastering and pointing ........ $240.07
Dec. 2–9. Plastering and pointing ........ $ 65.20

Disallowed. This work seems to have been made necessary by the condition in which the sewers were left, the projections of cement, and the cement dropped by the workmen not having been removed while fresh. The expense falls therefore upon plaintiff, under sections 135, 254, and 256 of the specifications, which require the brickwork to be left smooth.

April 6. Resetting stub............. $33.75

Allowed for $9.78, on Seymour's testimony. Disallowed for balance.

Sept. 12–19. Material and labor, etc. $ 58.36
Sept. 29. Labor, etc............. $141.91

Allowed. This work seems to have been unavoidable.

It was done and should be paid for.

Oct. 13. Footbridge, etc............... $513.11

Allowed. If, as contended, the plaintiff has been already credited with $306.11, the present allowance must be only for the difference, namely, $207; but, in the contrary event, plaintiff must have credit for the entire $513.11.

April 30–May 3. Repairing brick sewer $14.26

Disallowed. Richardson does not testify from his own knowledge.

Feby. 26, 27. Labor, etc............. $51.98

Allowed. Admitted by engineer.

Oct. 31–Nov. 7–10. Repairing, etc..... $93.95

Disallowed. The question is simply one of quantity, upon which the decision of the engineer of the defendant board is final, under section 223.

May 18. Followed piles.............. $65.25

Allowed. Mr. Crotts does not say that the piles were not followed, or that the number of feet is not correct, but that under the specifications nothing was due for the extra work.

The difference between the parties on this question of followed piles is this: Plaintiff contends that if he is required to furnish a pile of 30 feet to be driven down that number of feet for a work requiring a pile of that length, and after the piles are on the ground the engineer requires him to drive them down deeper than 30 feet, he is entitled to be paid the cost of this extra driving. On that proposition there would not seem to be much room for difference of opinion. As the contract makes no provision for such a case, plaintiff proposes to deal with the situation as if piles of the requisite length had been ordered, inasmuch as the cost of driving the short piles beyond their depth is greater than the difference between their cost and that of the longer piles. Under these circumstances, we can find no reason why plaintiff should not be paid as if the longer piles had been furnished, since the shorter piles, when thus driven beyond their depth, answer every purpose of the longer piles, and the driving of them this extra depth costs plaintiff more than what the difference between their cost and that of the longer piles would have been.

May 19. Ducts in Independent trench $673.62

Disallowed. Eastwood and Webb are positive that Shanahan, plaintiff's superintendent, solicited permission to lay the duct later, and that he assigned as his reason that in that way he could back-fill the trench with his machine and not be delayed.

To some extent Eastwood is corroborated by Lee and Crotts. This testimony we think overbears that of Shanahan.

### Exhibit F.

April 6. Extra labor, etc............ $424.67

Allowed for $300 on testimony of Crotts, and disallowed as to balance.

April 6, 7 & 8. Taking up, and relaying, extra lumber... $10.36

Disallowed. Oliviera testifies there was a good, hard blue clay bottom when pipe was first laid.

June 24–Sept. 19. Repairing first failure trench AA.. $708.29

Allowed. Defendant having been held responsible for this failure, this bill is allowed. The items of labor and material are given in minute detail, and no error is pointed out in them.

We consider the items sufficiently proved. In a case of this kind, involving a thousand items, every item cannot be dwelt upon with evidence as if only one item were involved. There would then be no end to the case. We have already adverted to this feature of the case, but will here add that a contractor on a large and long protracted work of this kind

cannot be expected to preserve as he goes along the evidence by which to prove in court every item of expense, should same come to be thereafter contested. The cost of preserving the proof of the item might in a great many instances exceed the amount of the item. All that can be expected of him is that he will furnish an itemized bill from the books, or records, which it was necessary for him to keep, and that those who kept the accounts shall testify that the entries were made at the time the expenses were incurred, and that the account is correct to the best of their knowledge and belief; and also that he will submit the data from which the account has been made in case they are called for, and will prove in the ordinary way any item that is specially contested. Especially is such proof sufficient in a case of this kind, where the same items, in so far as correct, ought to figure in the accounts and books kept by defendant. The several exhibits presented by plaintiff have been made out and testified to in that manner. They are fair upon their face, containing only such expenses as are likely to have been incurred, and as are more or less admitted to have been incurred, in the prosecution of the work.

Sept. 19. Laying conduits, etc...... $1,549.84

Disallowed. For same reasons as for items May 19, Ducts in Independent Trench, $673.-62, in Exhibit E.

Sept. 14–28. Repair trench, between Mandeville and Spain, and incidental expenses ................ $239.61 $ 86.25 $ 40.40 $146.97 $150.00 $333.00

Allowed, for same reason as for trench AA, supra.

Sept. 21–23. Sundry bills, for expenses incident to repair work, supra ............... $86.25

Allowed, for same reason as for the repair work itself.

The remaining items of this Exhibit F are set down generally as expenses incurred in repairing the failures on Robertson street. We hold that the exhibit shows correctly the amount of the expenses, and further proof in that regard will not be required; but it does not contain, and the briefs do not refer the court to, the data which would enable the court to ascertain which of these expenses were incurred for those of the failures for which defendant has been held responsible. The trial court will have to make this apportionment as best it can. Doubtless the work can be done from the books in evidence; but, if so, this court does not feel called upon to do this mere clerical work.

### Exhibit G.

Jan. 7. Extra labor, etc............. $20.24.

Disallowed.

Sept. 19. Extra material, etc........ $24.00

Allowed, if not already credited, as contended; otherwise, disallowed.

The other items on this Exhibit G are for the expenses of repairing the two failures on Jourdan avenue, for only one of which failures the defendant board has been held responsible. Here, again, we are confronted with the difficulty of ascertaining which, or what proportion, of these expenses must be attributed to that one of the failures for which the defendant board has been held responsible. As with the like expenses under Exhibit E, the court finds that the exhibit correctly sets forth the amount of the expenses, and leaves to the trial court to apportion to that one of the failures for which the defendant is held responsible the parts of these expenses incurred upon it.

### Exhibit H.

Allowed for $999.17, amount admitted; otherwise disallowed.

### Exhibit I.

Nov. 11. Followed piles............. $343.00

Allowed. We do not find that the defendant's engineers contested the amount of this bill, but only its being a proper charge under the specifications.

Dec. 4. Repairing leaks.............. $6.00

Disallowed. Part of construction work.

Dec. 7. Removing braces, etc.......... $31.00

Disallowed. The engineer is right in his construction that the expense of removing such braces, etc., as had to be removed in course of construction fell to contractor.

Dec. 15. Removing braces, etc........ $26.45

Disallowed. No proof that it was through the fault of the engineer that these braces, etc., were originally put in wrong.

Dec. 16, 17. On forms, etc........... $26.81

Allowed, unless trial court should find that it has already been credited.

Dec. 23, 6. Putting oyster shells....... $4.70

Allowed, unless already credited.

Dec. 24. Removing braces, etc........ $32.56

Disallowed. Same reason as for item December 7th.

Dec. 29. Painting I-Beams, etc....... $26.05

Allowed. Admitted.

Jan. 16. Taking out braces........... $26.82

Disallowed. Same reason as for item December 7th.

Jan. 26–Mar. 14. Removing, etc..... $890.36

Allowed for $703.55. Disallowed for balance.

Aug. 1–17. Force acct., etc........... $79.47

Allowed for $66.55. Disallowed for balance.

Sept. 19–Nov. 3. Grading, leveling, etc. ........... { $117.65 / $151.52 / $ 15.64 }

Allowed for $229.00 on testimony of Grotts. Not to be credited again if already credited. Disallowed for balance.

### Exhibit J.

June 14. Followed piling........... $108.50

Allowed. Same reasons as for item May 18th, $65, Exhibit E.

July 2. Lumber, etc................ $389.03

Allowed, unless already credited.

July 15. Cast-iron plates........... $19.75

Allowed, unless already credited.

June 15–Dec. 15. Force account, etc... $334.29
Allowed, unless already credited.

Aug. 25. Removing forms, etc......... $20.47
Disallowed. Same reasons as for item December 7th, Exhibit I.

### Exhibit K.

Followed piling...................... $53.75

Allowed. Same reasons.

Feby. 25. Lumber in forms for concrete .................. $362.23

Allowed, less $73.70, unless already credited. The $73.70 is disallowed.

April 11. Miscellaneous, etc......... $97.55

Allowed, unless already credited.

The other items of this Exhibit I, amounting, with those hereinabove considered, to $1,664.13, are allowed, unless already credited, with the exception of those which will now be considered specially.

The evidence shows that the water came suddenly into this pumping station, and hence that it could not have come by seepage. Mr. Crotts saw it only the day after it had "broke in," at which time there was not so good an opportunity for knowing in what manner it was coming.

The cleaning charged for was not ordinary cleaning out of sewers under the contract, but extra work brought upon plaintiff by fault of defendant.

April   5.   Making and setting forms... $ 8.75
  "      18.   Removing braces........... $ 9.20
April  17.   Removing braces.......... $ 7.00
  "      22.      "          "    .......... $12.75
May    4.      "          "    .......... $19.86

Disallowed. For same reason as for item December 7th, Exhibit I.

May 2. Switchboard, etc.............. $3.82

Allowed, unless already credited.

### Exhibit L.

Followed piling...................... $137.50
     Allowed, for reasons already stated.
June 6. Shells ...................... $5.00

     Allowed. They were ordered.

     The other items of this exhibit are allowed, unless already credited, except that the following are disallowed for reasons already stated:

June 16.   Removing braces........... $ 4.15
May 20.     "     "     ........... $10.25
June 7.     "     "     ........... $21.30

### Exhibit M.

Damages to adjoining property paid
     by plaintiff..................... $2,499.16

     Disallowed. Contract expressly provides such damages must be made good by the contractor.

Increase cost of laying sewer....... $8,441.39

     Disallowed. Not proved.

Jan. 2–Mch. 3. Idleness of equipment $510.00

     Allowed. Compromise included only pumping.

Delay on Palmyra.................. $260.00

     Disallowed. Not proved, and no putting in default.

For idleness of machines while waiting for permission to begin work
     on pumping station.............. $3,240.00

     The plaintiff, no doubt, suffered heavy loss in this connection; but, for all that appears, the defendant board was not aware that the delays were thus injurious to plaintiff. Plaintiff should have advised the defendant of the situation, or, in other words, put it in default.

     Disallowed.

     The next item, $22.80, is disallowed.

Delays occasioned by neglecting to operate
     the drainage pump, etc............... $530

     Allowed. It is not very clear why defendant considered itself under the obligation to keep the water down to 13 on the gauge; but there can be no denying that it and plaintiff acted upon that assumption, and it certainly failed to do so, and thereby caused plaintiff damage to the said amount.

Delay in securing right of way in
     Sisters' street.................. $1,110.00

     Disallowed. For reasons assigned by trial judge. No putting in default.

Expense, etc........................ $650.00

     Disallowed. Abandoned.

### Exhibit O.

Aug. 18. 3 Cu. yds.................. $4.35.

     Allowed, unless already credited.

Aug. 18. Replacing masonry, etc...... $42.00

     Allowed. This was work done a second time, because of error of engineer, and therefore not covered by the specifications invoked.

Aug. 28. 7 men, etc................. $26.74

     Allowed, unless already credited.

Aug. 30. Louisiana Ave., etc.......... $4.00

     Allowed. Wrong grade of engineer.

Aug. 31. Cutting, stup.............. $10.75

     Allowed.

Sept. 3. Replacing masonry, etc....... $17.40

     Allowed. Work done a second time.

Sept. 22. Toledano street, etc........ $35.00

     Allowed.

Sept. 3 & 30. Aline street, etc....... $136.03

     Allowed. Section 207 does not apply.

Oct. 3. Relating, etc................. $7.25

     Allowed, if not already credited.

Oct. 26. Extra excavation........... $4.35

     Allowed, unless already credited.

Dec. 9. Extra excavation, etc........ $29.00

     Allowed for 10 yards, instead of 20, unless already credited. Engineer's measurement conclusive. Disallowed for remainder.

Dec. 12. Extra excavations, etc....... $2.90

     Allowed, unless already credited.

Dec. 15. Concrete, etc.............. $18.00

Allowed for $6, unless already credited. Engineer's measurement, conclusive. Disallowed for remainder.

Dec. 15. Extra labor, etc............ $10.70

Disallowed. Not proved.

Dec. 23. Extra labor, etc............ $7.45

Allowed, unless already credited.

Dec. 30. Extra labor, etc............ $22.92

Allowed, unless already credited.

Feby. 15. Cutting, etc............... $2.88

Allowed, unless already credited.

Feby. 25. To taking up; etc......... $12.00
Mch. 1.      .......................... $23.00
 " 21       .......................... $ 6.33
 " 28.      .......................... $ 9.20
April 1.    .......................... $11.17
 " 1, 4.   .......................... $ 2.48
May 25–June 2. ..................... $19.55

Allowed, unless already credited.

May 30. Replacing masonry......... $14.70

Disallowed. Under specifications 196, 197, and 217.

June 2.      Repairing ............. $11.83
 " 24–25. Cinders, etc............. $31.50

Allowed, unless already credited.

July 25. Repairing, etc............ $113.59

Allowed, unless already credited.

Sept. 4. Labor, etc................. $90.70

Allowed for $68.20. Disallowed for balance, on testimony of Crotts.

Sept. 12. Labor, etc............... $105.80
 " 24. Labor, etc............... $ 71.32

Allowed, unless already credited.

Oct. 31. Material, etc............. $655.69

Disallowed. Already paid.

Nov. 30. Difference, etc........... $12.98

Disallowed. Already paid.

Mar. 17–31. Gravel, etc........... $ 23.00
May 9.        Labor, etc........... $ 15.53
May 1.        Oyster shells......... $159.00

Allowed, unless already credited.

May 1, 1905. Increased cost of cleaning sewer, by reason discontinuance of Jumbo..... $2,877.71

The Jumbo was an appliance devised by Shea. It was simply a wooden disk of nearly the same diameter as the sewer, with a flexible rubber edge. By drawing it through the sewer pipe, as construction proceeded, and while the cement was yet soft, all surplus cement was removed, and the pipe was left smooth. The evidence shows that it worked perfectly, and that the order for 'the discontinuance of its use was simply arbitrary. Plaintiff is clearly entitled to recover the difference in the cost of cleaning the sewers with or without this appliance; but what that difference is, the evidence does not show. This claim is therefore not allowed, but merely as in case of nonsuit.

May 26. Taking up, etc............. $13.25

The remaining items of this exhibit are not discussed in defendant's brief. Hence we assume are not opposed. They are allowed, unless already credited, except the items for interest, on page 12 of the exhibit, which are disallowed.

### Exhibit P.

Expenses of removing overhead wires in the way of plaintiff's construction machines. Disallowed.

These overhead wires were part of the difficulties which the contractor must be assumed to have known he would have to meet with in the execution of his work.

### Reconventional Demand.

The learned trial judge would not admit proof of the reconventional demand of $54,-014.92, for expense of repairing and cleaning sewers, on the ground that it was not set forth with sufficient detail, and when defendant filed a separate suit, setting forth the demand more in detail, and consolidated it with the present suit, he relegated the trial of said separate suit to some future time, to all of which defendant duly excepted.

Again, when defendant offered in evidence certain estimate sheets marked "D. Exhibits 602 & 604," with the accompanying receipt of plaintiff, showing payments for regular and extra work, the learned trial judge refused to allow defendant's witness to explain what items the payments were attributable to.

These rulings were erroneous, since, in the absence of the evidence thus sought to be introduced by defendant, it is now impossible to ascertain from the record what amounts are to be deducted for expenses of repair and cleaning and what amounts now claimed by plaintiff have already been paid.

Defendant's reconventional demand for repair of failures, and for correction and repair of minor defects and imperfections in the sewers is rejected, except as we now proceed to specify. Subject to due proof, the said demand is allowed, as follows: For the cost of repairing those of the failures for which plaintiff is held responsible in this judgment; also, for the cost of correcting and repairing minor defects and imperfections, as set forth in exhibit marked "Deft. 549" offered at page 2747, defendant, vol. 6; also, for taking mud out of pumping station B, as testified at page 2134, vol. 5 of record; also, for work done by Omner in cleaning Palmyra street sewer, and calking and cementing in said Palmyra street sewer; also, the cost of taking cement out of brick sewer on Villere street and Poland avenue crossing, and replacing bricks, as testified to at pages 2135 to 2138, Record, vol. 5.

The amount of $456.45 paid by defendant to Dowdle & Windett for repairing the manhole and sewer opposite pumping station No. 15, "Deft. 544 and 566," is fully proved, and must be debited to plaintiff; and so likewise the bill of Camden Iron Works, "Deft. 551," $225.12; and so likewise the bill of Camden Iron Works for cleaning conduits, "Deft. 550," $254.46; also the amount of $192.70 for

certain terra cotta pipe dispensed with. Except as here expressly allowed, the reconventional demand of defendant for $1,564.26 is rejected, for want of proof.

The question of whether plaintiff abandoned the work before or after notification to do so is unimportant in so far as regards the right to maintain this suit, for, as already explained in connection with the exception of no cause of action, the present suit, as it stands on this appeal, is simply in settlement of accounts. That question is important only in connection with the demand for liquidated damages. We find that the abandonment was before the notice; but we find, at the same time, that the defendant gave the example of breaching the contract, by refusing to pay plaintiff for the cost of the first repair of trench AA. Defendant was responsible for said failure, and yet refused to pay the expenses of repairing it. This was a violation of clause 263 of the contract. Defendant was further in fault by insisting that plaintiff should bear the expenses of the repair of those of the other failures for which defendant was itself responsible. At that time plaintiff was not behindhand with his work more than was fully offset by the loss of time which defendant had caused—notably by the delay in furnishing the plans for pumping station B, and in procuring a right of way in Sisters' street. By the notice to abandon the work, plaintiff was deprived of the right to go on with the contract, and, as a consequence, was relieved of the obligation of doing so, and the delays for failing to do so ceased to run against him. Perhaps, if plaintiff were held to have breached his contract, he might be held for whatever loss was thereby brought to defendant; but he cannot be held for liquidated damages for delaying to perform the contract after he had been deprived of the right to perform it. Whether defendant would be in a position to

sue for breach of contract is a question we need not consider. We think the whole trouble between the parties has come from the dispute over the responsibility for the failures, and that but for this dispute no claim for damages would ever have been thought of, no more than would several of the exaggerated claims which plaintiff has put forward, and we think that for that dispute defendant is as much, if not more, to blame than plaintiff. The demand for liquidated damages is therefore rejected.

As already stated, it will not be possible to cast the final account between the parties in this suit, owing to the rejection of defendant's evidence in support of its reconventional demand for $54,014.92, and in explanation of the estimates theretofore furnished to plaintiff, "Defendant Exhibits 602 & 604," going to show what amounts now claimed by plaintiff have already been credited to him; and the case will have to be remanded for that purpose. But so far as a fixed amount of indebtedness to plaintiff is absolutely and finally established in this suit, we shall render judgment for plaintiff. This fixed and absolute indebtedness we arrive at by—

Deducting from the amount admitted by
　defendant to be due, namely............. $79,607.28
The amount claimed by defend-
　ant in reconvention............ $54,014.92
And the several amounts allow-
　ed on the $1,564.26 reconven-
　tional demand, viz.:
D. 544-566. Dowdle & Windett　　456.45
D. 551.　　Camden Iron Works　225.12
D. 550.　　　"　"　"　　　364.46
　　　　Terra cotta pipe....　192.70　 55,253.65

　　　　Leaving an established in-
　　　　debtedness of...............　$24,353.63

The reason for here deducting in its entirety the $54,014.92 is that it is not possible to ascertain at present what is the exact amount of it that is due. The deduction, we need hardly add, is made only temporarily, until further trial, simply as a manner of casting the account, and not by way of giving judgment for the amount.

To the foregoing amount of................ $24,353.63
Add Irwin water on Palmyra as per com-
　promise ...................................... 1,000.00
Also those of the claims which have here-
　tofore not been admitted by defendant
　either in whole or in part, and which
　therefore cannot by any possibility have
　been included in the admitted credit of
　$79,607.28, to wit:

Exhibit B.

| | | |
|---|---|---|
| June 1-6. | Men and machine, etc.... | 559.48 |
| June 27. | Material, etc............... | 7.47 |
| Oct. 23-30. | Cleaning out, etc.......... { | 110.69 |
| | | 107.43 |

Exhibit D.

| | | |
|---|---|---|
| Nov. 10-11. | Diverting drainage....... | 22.58 |
| Dec. 8-23. | Irwin water............... | 635.22 |
| Mch. 8. | "　" expense, etc. | 79.07 |
| " 8. | Labor removing, etc...... | 12.77 |
| Apr. 13. | Repairs, etc., already credited for $55.73, now additionally credited for | 110.05 |
| May 29. | Cutting off, etc............ | 10.46 |
| Nov. 27. | Curbing, etc............... | 35.62 |

Exhibit E.

| | | |
|---|---|---|
| Sept. 12. | Material and labor....... | 58.36 |
| " 12. | " already credited for $125.81. Now additionally credited for.... | 16.10 |
| Oct. 13. | Foot bridge, etc., already credited for $306.11, additionally credited for.. | 207.00 |
| May 18. | Followed piles............ | 65.25 |

Exhibit F.

| | | |
|---|---|---|
| June 24. | Repairing ................. | 708.29 |
| Sept. 14-28. | Repair, etc................ | 996.23 |
| Sept. 21-23. | Sundry bills............... | 86.25 |

Exhibit I.

| | | |
|---|---|---|
| Nov. 11. | Followed piles............ | 343.00 |
| Dec. 29. | Painting I-beams......... | 26.05 |

Exhibit J.

| | | |
|---|---|---|
| June 14. | Followed piles............ | 108.50 |

Exhibit K.

| | | |
|---|---|---|
| | Followed piling........... | 53.75 |

Exhibit L.

| | | |
|---|---|---|
| | Followed piling, etc....... | 137.50 |
| June 6. | Shells, etc................. | 5.00 |

Exhibit M.

| | | |
|---|---|---|
| | Idleness of equipment, etc. | 510.00 |
| | Delays, etc................. | 530.00 |
| Aug. 18. | Replacing masonry........ | 42.00 |
| " 30. | Louisiana Ave. ............ | 4.00 |
| Sept. 3. | Replacing, etc............. | 17.40 |
| " 3 and 30. | Aline St., etc.............. | 136.03 |

Total for which executory judgment is
　now given.............................. $30,095.18

Except in so far as otherwise decided in this opinion, and except such items as defendant shall show have already been paid, the lower court will allow the items of plaintiff's exhibits Shea 13, and B, D, E, F, G, H, I, J, K, L, M, and O, changing, however, the classifications of material therein so as to conform with the views expressed in the present opinion, and changing the measurements and estimates of material therein so as to conform with those of the defendant board; and will allow plaintiff such part of the expenses of repairing sewer on Jourdan avenue, as set forth in Exhibit G, as plaintiff shall show is attributable to that one of the failures on that street · for which the defendant has been held in this opinion to have been responsible. It will try with this suit defendant's reconventional demand in so far as allowed in this opinion, only requiring that proof be made that the expenses therein claimed were actually incurred, and will give defendant credit for the amount of the present judgment, $30,095.18, and for $1,238.73, allowed in this opinion on the reconventional demand. Interest from · judicial demand, and the 15 per cent. called for by the contract, will be allowed pro and con. For greater facility in recasting, the judgment of the lower court will be set aside.

It is therefore ordered, adjudged, and decreed: That the judgment appealed from be set aside, and that there be judgment in favor of plaintiff, T. J. Shea, and against the defendant, the sewerage and water board of the city of New Orleans, for the sum of $30,095.18, with 5 per cent. per annum interest thereon from judicial demand; that this case be remanded for further trial on the points left undetermined by the present decision, in accordance with the views expressed in this opinion; and that the defendant pay the costs theretofore incurred in the lower court, except those of the separate suit filed by the defendant and consolidated with this suit,

the costs of which, · as well as the future costs of the present suit, are to abide the result of this suit on further trial. Plaintiff to pay costs of appeal.

BREAUX, C. J. I concur in the decree.